# Richmond

## JACKSON V. HEWLETT.

### March 13, 1913.

1. WILLS—*Disappearance—Revocation—Presumption.*—The well established presumption of law is that a will, known to have been executed, and the contents of which are proven, last traced to the possession of the testator and not found upon search at his death, is presumed to have been destroyed by him with the purpose to revoke it. But this presumption may be rebutted by competent evidence leading to the conclusion that the testator did not destroy it with intent to revoke it.

2. WILLS—*Disappearance—Presumption of Revocation—How Overcome—Declarations of Testator—Admissibility—State of Mind of Testator.*—Where the due execution and contents of a will are admitted or clearly established, but it cannot be found upon the death of the testator, and the cause of its disappearance is unknown, it is permissible, in order to repel the presumption of revocation by the testator, to prove the declarations of the testator made anterior to the making of the will, coincident with its preparation and execution, and subsequent to its execution showing his state of mind and determined purpose to provide liberally for the legatee named in the will, and his state of mind as to other relations and his desire that they should not have his estate at his death. Such declarations, repeated and persisted in from a time anterior to the making of the will up to within a few days of his mental and physical helplessness culminating in his death, establish a continued and unchanged purpose as to the disposition he desired to make of his estate, and negative the presumption that he had destroyed his will with intent to revoke it. Evidence of the testator's original purposes, and the mental attitude on which they were founded, of the condition out of which that mental attitude arose, of the consummation of that purpose in the will itself, and of the continuance of the conditions which produced the original mental attitude, all bear on and relate to the continuance of that attitude and tend to negative the presumption of revocation.

Appeal from a decree of the Chancery Court of the city of Richmond. From a decree refusing to set up a lost will and giving the estate to the heir, the legatee appeals.

*Reversed.*

The opinion states the case.

*Lightfoot & Tucker,* for the appellant.

*Hill Carter, Sol. Cutchins, Robert H. Talley,* and *C. W. Throckmorton,* for the appellees.

HARRISON, J., delivered the opinion of the court.

This suit was brought in the Chancery Court of the city of Richmond by the curators of the estate of William B. Williams, deceased, to the end that the court might adjudicate and determine the persons entitled to such estate and their respective rights therein.

The record shows that William B. Williams, who was advanced in years, died at his home in the city of Richmond on the 7th day of April, 1909, possessed of real and personal property which was appraised at $23,830.28, leaving surviving him a daughter, Mary P. Brown, who was born in lawful wedlock; one illegitimate daughter, Gertrude Jackson, the appellant; and certain collateral kin. It appears that the deceased was an illiterate colored man, being able only to sign his name, who acquired his estate, for the most part, as a huckster in the market at Richmond. No will of the deceased was found, and a number of persons asserted themselves as his heirs and claimed the estate. Gertrude Jackson, the appellant, claimed that her father had made and executed a will, which he believed to be in existence at the time of his death, under which she was the chief beneficiary; that said will had not been de-

stroyed by her father during his lifetime for the purpose of its revocation, but that it was in legal existence at the time of his death, and that if it was not found it was mislaid or misplaced, and that she was entitled to set it up as a lost will, and to have and enjoy the benefits thereof.

The chancery court entered a final decree holding that Mary P. Brown was the only heir and distributee of the decedent, who had died intestate and unmarried, and that as such sole heir she was entitled to the whole of his estate. From that decree Gertrude Jackson, by her guardian *ad litem*, has taken this appeal.

The record shows that the daughter, Mary P. Brown, married and left her father's house about seventeen years before his death, and that he saw very little of her after that. It further appears that the appellant, Gertrude Jackson, who was about sixteen years old at the time of her father's death, was an almost constant companion— certainly with him much of her time, especially aiding him in the conduct of his business as a huckster; that her father's affection for her was very marked, and that she was an efficient and trusted help in his business affairs.

The record shows beyond controversy—indeed, it is not denied—that in November, 1906, William B. Williams did make and duly execute his last will and testament. This will was prepared by a skilled and well known lawyer, who, after it was executed, delivered it into the possession of the testator. The provisions of this will are in strict accord and consistent with all of his previous statements and declarations as to the disposition he intended to make of his estate, and are so clearly established that they are not denied. The will gives the bulk of his estate to the appellant, and a few minor devises to others, including his daughter, Mary P. Brown. So far as the record discloses, this will remained, after its delivery, continuously in the possession of the testator. It is shown to have been

kept by him with other papers in an unlocked bureau drawer in his room, to which any one in the room had easy access. Between one and two months before his death, the sealed envelope, endorsed "William B. Williams' will," was seen in this same drawer, and a very short while afterwards the deceased was confined to his bed for the last time, though he had been able to walk about his room previously thereto. During the last days of his illness a number of his relatives, including Mary P. Brown, were back and forth in his room. The night of the day her father died the appellant examined the drawer where she knew the will was kept, for the purpose of getting it, and found that it was not there.

In opposition to the establishment of this will, conceded as to its execution and contents, there is invoked the well-established presumption of law that a will, known to have been executed, and the contents of which are proven, last traced to the possession of the testator and not found upon search at his death, is presumed to have been destroyed by him with the purpose to revoke it. It is, however, well recognized that this presumption is not always as a matter of course conclusive, but that it may be rebutted by competent evidence leading to the conclusion that the testator did not destroy the will with the intention of revoking it.

To rebut the presumption relied on by the appellees, the appellant introduced certain declarations made by the testator anterior to the making of the will, coincident with its preparation and execution, and subsequent to its execution. These declarations range from a period beginning a few years prior to the making of the will and up to within about two weeks of his death. They show the state of mind of Williams as to the appellant and his determined purpose to provide liberally for her, and his state of mind as to his other relatives and his desire that they should not have his estate at his death. Declarations of the same

character were made to his counsel and others during a period of several days when his will was being prepared, and the declared purpose of previous years is in perfect accord with the terms and provisions of the will as finally prepared and executed. The same declared purpose as to the disposition he intended to make and had made of his estate continued from the time of the actual execution of his will practically to the time when he took his bed for the last time. The sealed envelope endorsed "William B. Williams' will" was seen in his drawer from one to two months before his death. It was three weeks after this that he stated to his pastor that he had made his will and left what he had to those he wanted to have it. The last two weeks of his life he was bed-ridden and mentally and physically unable to act or comprehend. So that there was a very brief interval of only a few days between his last declaration that he had made his will and left what he had to those he wanted to have it, and two weeks before his death when he became physically and mentally helpless.

The declarations of the testator establish a continued and unchanged purpose as to the disposition he desired to make of his estate, from long prior thereto up to within a few days of his mental and physical helplessness, and negative the suggestion that he had destroyed his will *animo revocandi.* These declarations also show that a few days before he became helpless he believed that the will which carried out his long cherished purpose was in existence and would be effectual at his death. They also show his reasons for disposing of his property as he did, which were all sufficient to him, and they show that his mental attitude toward his relatives as well as toward his property was exactly the same, practically, when he died that it had continuously been for some years prior to his death.

It is insisted that this evidence, embracing these declarations of the testator, was admissible to show that he did

37

not knowingly and deliberately revoke his will, as leading the court to the conclusion that he did not do that which, in the absence of evidence to the contrary, he is presumed to have done, and that it was proper evidence, according to its weight, to rebut that presumption.

It is to be borne in mind that these declarations of the testator were not introduced for the purpose of proving the will, its due execution, or its contents. These things had been otherwise shown and were not denied. They were introduced as evidence showing a strong and unvarying adherence by the testator to his purposes with respect to the disposition of his estate, which had obtained for years prior to his death, both as to the beneficiaries thereunder and as to those omitted therefrom; and for the purpose of rebutting the presumption that this testator deliberately destroyed, with intent to revoke, a will he had so carefully prepared, and to which he had so firmly adhered.

To the admission of the evidence comprised in these declarations of the testator, those who contended that the deceased had died intestate objected on the ground that they came within the rule excluding hearsay evidence as to the declarations of the testator, and were, therefore, inadmissible. The court sustained these exceptions and held that the other evidence in the case was not sufficient to rebut the presumption that the will had been revoked. This brings us to the crucial question in this case on appeal, which is whether or not, under the facts and circumstances of this case, this evidence is admissible and should have been considered by the court in determining whether or not the presumption of revocation had been rebutted.

The admissibility of such declarations as those under consideration, in the case of a missing will, where the cause of its disappearance is unknown, as evidence of the testator's state of mind, for the purpose of overcoming the

presumption of revocation, has never been decided by this court.

Those opposing the introduction of such evidence rely on two Virginia cases: *Shacklett* v. *Roller,* 97 Va. 639, 34 S. E. 492, and *Wallen* v. *Wallen,* 107 Va. 131, 57 S. E. 596. Both of these cases involve premises wholly different from those in the case at bar. *Shacklett* v. *Roller* was not a case of a missing will, unaccounted for, but of a will which was admitted to have been destroyed by the testator, and the question was as to the sanity or insanity of the testator at the time he destroyed it. The court never intended, in that case, to include within the language relied on a case like this, where the destruction of the will is a presumed destruction, as contrasted with a known destruction as was the case there. In the Shacklett case the whole matter at issue was the sanity or insanity of the testator when he himself destroyed his will. There was a conflict of evidence as to when the testator was insane, upon consideration of which the court held that the complainants had failed to show that the testator was mentally incompetent to revoke. It is clear that *Shacklett* v. *Roller* is no guide to the solution of the question now before us.

The case of *Wallen* v. *Wallen, supra,* does not deal with the question presented in the case at bar, and is not helpful in its consideration. There the court was dealing with questions of testamentary capacity and undue influence, and held that upon such issues, the "declarations of the testator, not made contemporaneously with the execution of his will, were relevant evidence to show his feelings and affections towards the natural objects of his bounty, his mental condition as reflecting upon his testamentary capacity, but were not admissible to establish the substantive fact of undue influence."

The research of learned counsel in their exhaustive citation of authority for and against the admissibility of the

controverted evidence in this case shows that there is some conflict of opinion on the subject. A careful consideration of these citations has, however, satisfied us that the weight of authority and the better reason, both in England and America, is decidedly in favor of the view that, under the facts and circumstances of the case at bar, the excluded evidence was admissible to rebut the presumption that the will had been revoked. *Davis* v. *Davis* (1824), 2 Addams 225; *Saunders* v. *Saunders* (1848), 6 Notes of Cases 518; *Patten* v. *Paulton* (1858), 1 Swab & Tristram 55, 4 Jurist (N. S.) 341; *Whitley* v. *King* (1865), 10 Jurist (N. S.), Pt. 1, 1079; *Finch* v. *Finch* (1867), 1 Probate & Div. (L. R.) 154; *Re Johnson's Will* (1874), 40 Conn. 587; *In re Page* (1886), 118 Ill. 576, 8 N. E. 852, 59 Am. Rep. 395; *Foster's Appeal* (1878), 87 Penna. 67, 30 Am. Rep. 340; *Scroggins* v. *Turner* (1887), 98 N. C. 135, 3 S. E. 719; *Re Gardner's Will* (1894), 164 Penna. 420, 30 Atl. 300; *Gavitt* v. *Moulton* (1903), 119 Wis. 35, 96 N. W. 395; *Appeal of Spencer* (1905), 77 Conn. 638, 60 Atl. 289.

Other cases might be cited to the same effect, but the foregoing are deemed sufficient to show how extended and reliable is the opinion that the rejected evidence in the case at bar was admissible, under the circumstances, to rebut the presumption that the testator had revoked his will. It is difficult to see how, in a case like this, the presumption of revocation could be overcome except by evidence such as that here relied upon. It is impossible for the beneficiaries under the will to say what became of it; they can only assert that, whatever may have happened to it, the testator did not revoke it, and that the will was made, duly executed, and its contents clearly shown is conceded. There is not a scintilla of evidence that it was revoked, nor is there a cause suggested for revoking it. There is nothing to prevent its admission to probate as established except the presumption of revocation arising from the fact that it was

last traced to the testator's possession and not found after search at his death. It must be generally the case, in such a status, that the best evidence, if not the only evidence, that can be adduced to rebut the presumption of revocation is that the testator's mind for many years contemplated a certain disposition of his property; that when he disposed of that property by will his mental attitude was precisely the same that it had been during those previous years, and that after he made such disposition his mind remained in the same state practically until his death, supplemented by the consistency of his mental attitude towards his various relatives. These are held to be proper facts and circumstances to be considered as against the presumption that such mental attitude and state of mind had changed. It would seem that the question as to whether there had been a change of mind could not be better determined than by the acts and declarations of the person whose mind is to be judged.

Nor can such evidence be confined to a given period of time. It has nothing to do with the *res gestae,* for there is no *res gestae* involved in this case. Evidence of his original purposes and the mental attitude on which they were founded; of the conditions out of which that mental attitude arose; of the consummation of that purpose in the will itself; of the continuance of the conditions which produced the original mental attitude; all these bear on and relate to the continuance of that attitude, which is referred to in the English cases of *Saunders* v. *Saunders; Patten* v. *Poulton,* and others, *supra,* as "adherence."

Counsel for those opposing the will rely largely upon a number of New York cases. These cases rest upon a statute of New York which provides that "the plaintiff is not entitled to a judgment establishing a lost or destroyed will, as prescribed in this article, unless the will was in existence at the time of the testator's death, or was fraudulently

destroyed in his lifetime, and its provisions are clearly and distinctly proved by at least two credible witnesses, a correct copy or draft being equivalent to one witness." N. Y. Civil Code, Procedure, 6th Ed., sec. 1865.

The case of *Reifeld's Will,* 36 Misc. Rep. 472, 73 N. Y. Supp. 808, illustrates how rigidly these stringent statutory provisions are enforced. In that case the execution and contents were admitted. The delivery of the will by the testator to a confidential friend for safe-keeping was admitted. It was admitted that while in the possession of that friend it was destroyed in a fire which burnt the contents of his place of business. It was admitted that the testator was never apprised of the destruction of his will, being off on a trip at the time, and that while on this trip he died. In strict conformity to the language of the statute, citing section 1865, *supra,* the court held that the will could not be admitted to probate, because not in existence at the testator's death, and not fraudulently, but accidentally, destroyed in his lifetime. Cases resting upon this statute cannot be authority in a State where there is no statutory provision regulating the subject.

The appellees rely with apparent confidence upon the case of *Throckmorton* v. *Holt,* 180 U. S. 552, 21 Sup. Ct. 474, 45 L. Ed. 663. The discussion in that case and the language used undoubtedly tend strongly to sustain the contention of the appellees, and if the question involved had been the same as that in the case at bar it would have been persuasive authority. In that case the alleged will was in existence and the question was whether or not it was a forged document, the court holding that the lower court erred in admitting evidence upon the issue of forgery. The facts involved do not make this a case in point. for those who oppose the establishment of the will in the case now before this court. As already stated, the language of the court in discussing the admissibility of the testator's

declarations seems to have a general application, but if it was intended to be applied generally and to a case involving totally different facts it is *obiter,* and, therefore, not binding authority. In the Throckmorton case Justices White, Harlan and McKenna dissented as to all that portion of the opinion involving the discussion of the admissibility of testator's declarations.

In the case of *Ewing* v. *McIntyre,* 141 Mich. 506, 104 N. W. 787, the court refused to follow the Throckmorton case and adhered to the English doctrine as the established law in that State.

Mr. Wigmore, in his valuable work on Evidence, in note 2 to section 1736, criticises the Throckmorton case, saying that it makes the surprising statement that "the weight of authority so agrees;" and adds that "the opinion hopelessly ignores the various distinct kinds of testamentary declarations."

A review of all of the cases cited by appellees shows that most of them deal with issues involving fraud, undue influence, forgery and insanity, and, therefore, shed little light on the class of cases to which the one at bar belongs where the issue involves the unaccounted-for disappearance of a will which is conceded to have been executed and the contents of which were also established.

The leading English case involving the question raised by this appeal is that of *Sugden* v. *Lord St. Leonards, supra,* 34 L. T. (N. S.) 372. It was the case of a missing will, the absence of which was unaccounted for, and the question of the admissibility of evidence of the testator's declarations to rebut the presumption of revocation arising from failure to find the will upon search is discussed at length, the court holding the declarations admissible. In discussing the admissibility of such evidence, Jessel, M. R., says:

"But that goes only to the question of the weight to be

attributed to the evidence when admitted; it does not go to the question of admitting the evidence itself, and I must say it appears to me that, having regard to the reasons and principles which have induced the tribunals of this country to admit exceptions in the other cases to which I have referred, we should be equally justified and equally bound to admit it in this case. When I say equally, perhaps I state the case a little too low, because if there is any case in the world in which it is incumbent upon a tribunal not to grant a premium for fraud or wrong, not to hold out to the world that any man who is able to get hold of the will of a testator which may disappoint him of his expectations, just or unjust, if he once destroys it, shall be able to acquire the property, either for himself or for those whom he wishes to benefit—I say, if ever there was such a case, it is the case of a lost will. The court should be anxious not narrowly to restrict the rules of evidence which were made for the purpose of furthering truth and justice, but, guided by those great principles which have guided other tribunals in other countries in admitting this kind of evidence generally, to admit it at all events in the special case which we have under consideration.

"I, therefore, entirely concur in the Lord Chief Justice's conclusion that this evidence is admissible, not only as regards that portion of it which is anterior to the execution of the will, but also as regards that portion of it which is posterior to its execution. As regards that portion of it anterior to the execution, it has been admitted, where it has been admitted at all, on a somewhat difficult ground. It is not strictly evidence of the contents of the instrument. It is simply evidence of the intention of the person who afterwards executes the instrument. It is simply evidence of probability—no doubt of a high degree of probability in some cases, and of a low degree in others. The cogency of the evidence depends very much on the nearness

in point of time of. the declaration of intention to the period of the execution of the instrument."

The case of *Davis* v. *Davis, supra,* is an earlier English case, but frequently cited, in which Sir John Nicholl says: "All his declarations to the Burtons and others are fully confirmatory of his alleged intentions to give the residue of his property to Mrs. Davis. * * * But the instrument is not found upon the death of the testator, and, as it was left in his possession, the legal presumption is that he himself destroyed it *animo revocandi.* This presumption, however, may be repelled by evidence, nor does it require evidence amounting to a positive certainty, but only such as reasonably produces moral conviction.

"The whole conduct of the deceased, and his declarations down to the very evening of his death, render it most highly improbable that he should have revoked this codicil." The opinion then proceeds to detail the facts and circumstances as to the custody of his papers by the deceased, and other circumstances, and concludes: "Upon the whole I feel morally convinced by the evidence produced that * * * it was not revoked by himself."

The other cases cited, *supra,* both English and American, are in harmony with the two English cases from which we have quoted, and we deem it unnecessary to prolong this opinion by quotations from each of them.

In Rood on Wills, sec. 357, it is said: "The presumption of revocation from failure to find the will, or from finding it mutilated, is never conclusive, and exists only in the absence of evidence to the contrary. All the circumstances of the case may overcome it, though there may not be any one circumstance sufficient in itself to do so. It may be disproved in most States by showing inconsistent declarations of the testator, though not part of the *res gestae;* and it may be confirmed by showing other declarations indicating that the will was revoked."

To this section many cases are cited from England and America.

In Page on Wills, sec. 443, it is said: "The declarations of testator are held to be admissible in evidence, both to rebut the presumption of revocation which arises from the disappearance of a will which was in testator's custody, and to strengthen such presumption. Thus the declarations of testatrix, made within three days of her death, that her will was still in existence, and that the notary with whom she had originally left it still had it, were held sufficient to rebut any presumption of revocation arising from the fact that the will could not be found, and that the notary testified that he did not have the will, and believed that testatrix had it last."

In section 445 the same author says: "Evidence of the testator's character is admissible in so far as it *shows his tenacity of* purpose, and thereby the probability of his revoking his will. So, in evidence of testator's feelings towards those who would take if he were to die intestate. So evidence of the conduct, character, and interest of those who were about testator, and had opportunity to destroy his will, is admissible as bearing upon the question whether testator destroyed his will or someone else."

In Greenleaf on Evidence (16th ed.), sec. 162-e (1), p. 260, it is said: * * * "(b) But it is possible to admit them without breaking into the hearsay rule. It may be said that the testator's declarations are evidence of his state of mind, *i. e.,* his belief, either as indirect evidence, or as assertions admissible under the present exception; and that then, by a second step, his belief is circumstantial evidence, retrospectively, of his having done, or not done, the act in question, *e. g.,* his belief that he destroyed a will is evidence that he did destroy it. This mode of treating the statements was adopted by Mr. J. Hannen in *Keen* v. *Keen,* and later in *Sudgen* v. *Lord St. Leonards;* and has appa-

rently also been the foundation of a number of American cases admitting such statements."

In Thornton on Lost Wills, sec. 58, it is said: "All the cases, however, hold that the presumption of revocation may be rebutted. It will thus be seen that this presumption is only a *prima facie* one. It may be rebutted aside from declarations of testator, by circumstances showing an intention not to revoke the will."

In section 59 it is said: "From the quotation just made it will be observed that the declarations of the testator, showing that no revocation has taken place, are admissible to rebut the presumption. \* \* \* Thus, the declarations of unchanged affection for the devisees, and unchanged intentions, have much weight and tendency to overthrow the presumption, even though made at any time between the time of the execution of the will and his death, but the later they are the more potent."

In section 83 the same author says: "The relationship of the testator to the alleged devisees or legatees, their ages and circumstances, his affections, evidenced by expressions and acts for them may be given in evidence as tending to show the probability of the disposition he made of his property, if that probability corresponds with the alleged contents of the will. So, no doubt, his dislike of a legatee might be shown to contradict his claim that the will was in his favor, as alleged."

Inasmuch as the crucial question involved on this appeal is one of first impression in this State, we have gone very fully into a careful consideration of the authorities in other jurisdictions, and are satisfied, both upon reason and authority, that the evidence which was excluded in the case at bar was admissible as tending to rebut the presumption arising from the absence of the will that the testator had destroyed it *animo revocandi*.

We are further of opinion from all the facts and circum-

stances shown of record, including those shown by the evidence which was improperly excluded, that they are abundantly sufficient to support the conclusion that William B. Williams did not destroy his will with revocatory intent, but that said will was legally in existence at the time of his death, and that it must be established, and the estate passing  thereunder  disposed of in accordance with its proven provisions as shown of record.

The decrees appealed from must, therefore, be reversed, and the cause remanded for further proceedings in accordance with the views expresed in this opinion.

*Reversed.*