COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:    Judges Ortiz, Raphael and Senior Judge Annunziata
Argued by videoconference


JOANNE KREISER

                                                    MEMORANDUM OPINION* BY
v.        Record No. 1471-24-4                      JUDGE DANIEL E. ORTIZ
                                                    SEPTEMBER 23, 2025

GARY PEEVELY, ET AL.


            FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
                        Patrick M. Blanch, Judge

            Paul A. Prados (Executive Law Partners, PLLC, on briefs), for
            appellant.

            Linh H. Ly (Law Office of Linh H. Ly PLLC, on brief), for appellee
            Gary Peevely.

            No brief or argument for appellee Kenneth Kreiser.


        Joanne Kreiser challenges the circuit court admitting to probate a copy of her brother,

Eric William Kreiser's will.  She argues that the circuit court erred by presuming that the original

will was lost and requiring her to prove that Eric had revoked his will.  Kreiser also argues that

Gary Peevely, the proponent of the will, did not prove by clear and convincing evidence that the

original will had been lost rather than revoked.  Finding no reversible error, we affirm the circuit

court's judgment.

---

        * This opinion is not designated for publication.  *See* Code § 17.1-413(A).

BACKGROUND

We state the facts in the light most favorable to Peevely, the prevailing party below.[1]  *See Glynn v. Kenney*, 77 Va. App. 70, 73 (2023).  Eric and his life partner, Raymond Dexter Thomas, II, began their relationship in 1987.  During their relationship, they purchased a house in Vienna, Virginia, and a condominium in Florida.  In 2008, they jointly retained a law firm to prepare estate-planning documents.  Eric and Thomas each executed a will, trust agreement, and related estate-planning documents; each also executed deeds that transferred his interests in the house and condo to his trust.  The law firm provided the original estate-planning documents to Eric and Thomas and retained photocopies.

Eric's will gives his tangible personal property to Thomas and his residuary estate to the trustee of his trust.  If Thomas predeceased Eric, or upon Thomas's death if he survived Eric, the will allows Eric's family members to select items of his tangible personal property for themselves.  Eric's trust agreement directs his trustee to keep the trust property in trust for Thomas's benefit; upon Thomas's death, the trustee is to pay outright one-third of the trust property to each of Thomas's niece and nephews.  Eric named Karen Peevely, Thomas's sister, as successor co-trustee.

Thomas died in July 2020.  Eric died unexpectedly in April 2022.  Thomas's brother-in-law, Gary Peevely, petitioned the circuit court to admit a photocopy of Eric's will to probate.  He alleged that Eric had validly executed the original will but that the original's last known location was Eric's house in Vienna and it could not be found.  Peevely alleged that the Vienna house had been flooded in July 2019, which significantly damaged Eric's belongings, including documents.  Further, post-flood remediation work revealed the presence of asbestos, which required the removal of all personal belongings from the house.  Peevely alleged that these incidents "likely contributed to" the

---

[1] Appellee Kenneth Kreiser, Eric and Joanne's brother, did not participate in the proceedings below or in this Court.

loss of the original will and that Eric had not intended to destroy or revoke it. Kreiser, then serving as the administrator of Eric's estate,[2] answered the petition and asserted that Eric had revoked his will because it had last been in his possession and could not be located after his death.

At trial, Peevely testified that Eric told him in 2009 about making his will and that Peevely's children "will be taken care of." Peevely had a good relationship with Eric from the very beginning. Eric had a "really good" and "close relationship" with Thomas's niece and nephews[3] and attended the 2014 wedding of Thomas's niece. Eric maintained those relationships even after Thomas's death. Eric and Thomas spent vacations and holidays with Thomas's family; Peevely visited the Vienna house "many times" between 2009 and 2019. The last time he saw Eric and Thomas together was in 2017, at Thomas's parents' house. Eric never told Peevely that he wanted to revoke, destroy, or change his will or trust, and Peevely had no knowledge that Eric ever did so. Eric never discussed his biological family with Peevely.

In 2010, Eric moved to Florida for his work while Thomas remained in Vienna for his own job. Eric and Thomas visited each other regularly while they lived apart. Thomas was a "pack rat" and "not the neatest" person, whereas Eric was "more fastidious." The Vienna house deteriorated after Eric moved to Florida. Peevely and Karen visited the Vienna house in early July 2019 to help Thomas, who had some health problems; Eric was in Florida. The house was in disarray and "a mess." Peevely took a photograph of a downstairs office and "storeroom," which had "boxes of papers," "piles of" clothing, and large shopping bags that had never been unloaded.

---

[2] The circuit court removed Kreiser as administrator and appointed a curator of the estate by orders entered in March 2023. Those orders are not at issue in this appeal.

[3] Thomas had two nephews and a niece: Thomas Peevely and Meghan Peevely Woodward, whose parents are Gary and Karen Peevely, and James Cheek, whose mother is Kathy Cheek, Thomas's sister.

During their visit, the house flooded in a heavy rain; water poured down the stairs into the lower level "like a waterfall." Peevely went downstairs and found water that was deep enough to cover the tops of his shoes. He, Karen, and some of Eric and Thomas's friends worked to remove the water and dry the rooms. Over the next few days, they threw away a lot of papers, many "not identifiable." They filled 30-gallon trash bags, "shoveling a lot of the stuff in" because it was so waterlogged. He estimated they filled more than ten trash bags. They also discarded old mattresses, furniture, and other items.

During later remediation, workers discovered asbestos in the house. Thomas had to move out of the house, and all remaining personal items had to be removed so that the asbestos could be removed. Thomas died during that remediation. The house's contents were returned in September 2020. After Thomas's death, Eric and Peevely discussed Thomas's assets, all of which passed to Eric by deed or beneficiary designations, so no originals of Thomas's will and trust were needed. Eric also received Thomas's life insurance proceeds.

Karen testified that Eric had a good, loving relationship with her family and that relationship did not change after Thomas's death. She recalled Thomas and Eric telling her and Peevely in 2009 that they had made their estate plans, under which Thomas's niece and nephews would be "well taken care of." Eric never mentioned his biological family to her. He never expressed any desire to revoke or change his will or trust agreement and, as far as she knew, never destroyed his will. The last time she saw Eric and Thomas together was in 2017. She last talked with Eric in March or early April 2022, shortly before his death.

Karen recalled that the flood in July 2019 damaged "documents, boxes of papers," "piles of clothing," "books," and everything else "that could soak up water." The cleanup from the flood involved throwing away "a lot of things," including "papers [and] documents." Many of the items were "all gummed up together" and "had to be scooped up with shovels." The documents they

- 4 -

discarded were "ruined" and unidentifiable. They threw away "[n]umerous trash bags" filled with damaged items. The initial cleanup lasted several days. The following summer, the house's contents were packed up and stored during remediation.

Diana D'Alessandro, a lawyer with the firm that had prepared Eric's will, testified that he contacted her in "early 2021." Eric told her that he could not find the originals or copies of Thomas's documents or his own and thought that perhaps they had been lost when the house flooded. D'Alessandro reviewed the terms of his will and trust with Eric to ensure that they still reflected his wishes; she also sent him copies of the documents. Eric believed that his estate plan was still in effect, confirmed that he wanted his assets to go to Thomas's family, and did not "express an intent to destroy," "revoke," or "change" his will. D'Alessandro testified that she did not recall Eric ever mentioning his biological family to her. D'Alessandro informed Eric about the legal consequences of not having the original will and advised him to execute a new one. His primary concern at the time was "figuring out what to do" about Thomas's assets and Thomas's missing documents; he did not contact her to execute a new will.

Lynn Hoover, a real estate agent who had helped Eric and Thomas purchase the Vienna house, had become "close friends" with them. She testified that from the end of 2021 through his death, she helped Eric with personal matters, such as doing some shopping and taking him to the DMV. She listed the Vienna house for sale in March 2022; it sold after Eric's death. In February or March 2022, Eric was "very concerned" that he could not find the original will and trust documents and told her about the flood. He showed her a copy of his will that was in a "file cart" by his desk in the dining room and expressed concern about the effect of not having the original. He continued to desire, as expressed in the will, that his assets pass to Thomas's niece and nephews. He did not tell her he wanted to revoke or change his will, and she was unaware of any events that would have caused him to do so. Over the years that Hoover knew him, Eric told her that his family had

- 5 -

"abandoned" him because he was gay and that he felt fortunate to have Thomas's relatives as "family"; she stated that "he spoke of [Peevely] often."

Kreiser, Eric's sister, testified in Peevely's case-in-chief and in her own after the circuit court denied a motion she made to strike the evidence. She maintained that she had a "close relationship" with Eric and "didn't care" about his sexuality. They talked by phone on special occasions, such as her birthday, Thanksgiving and Christmas, and in between. They "knew what was going on with each other." Still, she admitted that he had not told her about his 2008 will or selling the Vienna house. She also admitted that she had not vacationed with him, although she stayed with him once in Florida while she attended a bowling event in 2013. They did not spend holidays together, which she attributed to her having to work, and did not routinely socialize together. Kreiser testified that she stopped working in May 2003 due to a disability.

Kreiser also admitted that Eric had a "poor relationship" with their mother because of her "prejudices," which began when he and Thomas first got together in the 1980s and continued for 20 years. Kreiser stated that she and their dad "pok[ed] at" their mom's prejudices during those years. Despite their differences, Eric and their mom talked about wine and politics. And whenever Kreiser talked with their dad, he "always asked" how Eric was doing; still, his relationship with Eric was "restricted" because of their mom's views. Their mother passed away in a nursing home in October 2019. Eric visited their mom, but she mistook him for another son with whom she was not on good terms at the time and told him to leave and not return. Kreiser attributed this mistake to their mom suffering from dementia.

According to Kreiser, Eric moved back to Virginia in late September 2019, before asbestos remediation on the Vienna house was complete. He called and told her that he needed a place to live. She "conditionally agreed" to let him stay with her. She explained that she did not trust him "in certain aspects of life" because he was an alcoholic and a "mean drunk." While he lived with

- 6 -

her, they did not discuss him moving back to the Vienna house, where Thomas was living. Kreiser was in regular communication with Thomas; they also did not discuss Eric's moving into the Vienna house. Eric stayed with her until Christmas, when he said that he "needed a little more space" and they were invading each other's privacy. She believed that he wanted to leave because she was "messy in some areas," whereas he was "regimented on cleanliness."

At Eric's request, Kreiser took him to a hotel. Eric stayed in that hotel and another one nearby from December 25, 2019, through January 2, 2021. He did not move back into the Vienna house until after Thomas's death, and she learned that he had moved not from him but from a friend. After Eric died, she and a friend went to the Vienna house, where they found copies of his will and trust agreement in the filing cabinet in the dining room. The filing cabinet also contained bills, bank statements, and personal memorabilia, including something from Thomas's father.

During closing argument, Peevely contended that the circuit court should presume that Eric's will had been lost. Peevely also urged, however, that even if the court applied a presumption of revocation, the evidence rebutted that presumption and proved that Eric did not intend to revoke his will. He emphasized the flood damage and remediation that followed, which provided the "most likely reason" the original will could not be found. No evidence suggested that Eric had ever expressed a desire to revoke or destroy his will, and he continued to have a close relationship with Thomas's family after Thomas's death.

Kreiser argued that the circuit court should presume that Eric had revoked his will because it had been delivered to him after he executed it but had not been traced out of his hands to someone else's custody. Kreiser contended that Eric chose to die intestate by not executing a new will after D'Alessandro told him that he needed an original will to make his estate plan enforceable. She also argued that the evidence demonstrated that Eric's relationship with Thomas had deteriorated since Peevely and Karen last saw them together in 2017. Kreiser

emphasized that Eric's relationship with her was good by the end of 2019, when he evidently did not have a good relationship with Thomas. She emphasized that Eric visited their mother before her death and turned to Kreiser, not Thomas, when he needed a place to stay, even though he co-owned the Vienna house in which Thomas was living. Kreiser urged that the fact that Eric chose to move from her house to hotels proved that he and Thomas "weren't together" by the end of 2019.

After argument by counsel, the circuit court found that Eric's will had been out of his custody for at least one year before he died. Accordingly, the circuit court applied the presumption of loss rather than of revocation. The court credited D'Alessandro's testimony that Eric requested a copy of his will in 2021 and expressed to her that he wanted to dispose of his assets according to his will. The court found that Eric displayed that continued testamentary intent by storing the copy of the will he received from D'Alessandro with his other important papers. Despite whatever "fallout" may have happened in his relationship with Thomas, Eric "displayed no indication of change in intent, and furthermore, reaffirmed his prior intent" after Thomas's death. The court found that Kreiser had not "presented clear and convincing evidence that Eric revoked his will."

The circuit court also found that, even if its applying the presumption of loss were erroneous, Peevely had rebutted the presumption of revocation by showing, through clear and convincing evidence, that Eric's will was not revoked. As for the lack of intent to destroy his will, the court found the evidence of what Eric did after Thomas's death "most compelling." Eric made known that his original will had been lost, wanted to obtain a copy of his will, and said that he "maintain[ed] his testamentary intent as set out in the 2008 will." Eric showed Hoover a copy of that will in the months before his death, which was stored in the same place that Kreiser found it after his death. The evidence also supported multiple possibilities for the

loss of the will, "most plausibly that it was left behind in the Vienna house when Eric moved to Florida and was destroyed by the July 8, 2019 flood and the subsequent cleanup and remediation efforts." The court found that those possibilities explained why Eric's original will was not found upon his death. Accordingly, the circuit court found that, even under the presumption of revocation, Peevely had proven by evidence that "far exceeded the clear and convincing evidence threshold" that Eric had not intended to revoke his will. Rather, "without a doubt," the will was "lost or destroyed without the intent to revoke sometime after Eric moved to Florida." The circuit court ordered that the copy of Eric's will be admitted to probate. Kreiser appeals.[4]

## ANALYSIS

Two possible presumptions arise when a testator has executed a will that cannot be located at his death. If the will "was known to be in the testator's custody but cannot be found after death, there is a presumption that it was destroyed by the testator . . . with the intention to revoke." *Johnson v. Cauley*, 262 Va. 40, 43 (2001). To overcome this presumption of revocation, the proponent of a copy of the will must "assign and prove some other cause for its disappearance, by clear and convincing evidence, leading to the conclusion that the will was not revoked." *Glynn*, 77 Va. App. at 76 (quoting *Brown v. Hardin*, 225 Va. 624, 626 (1983)). The proponent does not have to "specifically prove what became of the missing will," however. *Edmonds v. Edmonds*, 290 Va. 10, 23 (2015). The evidence sufficient to overcome the presumption "will take different forms depending on the facts and context of each individual case. In some cases, the proponent may present evidence regarding what could have happened to the will; and in other cases, there may be no evidence to explain why the will is lost or missing." *Id.* Alternatively, if "after execution the

---

[4] As a threshold matter, Peevely filed a motion to dismiss, asserting that Kreiser failed to timely note her appeal. But this Court, by prior order, granted Kreiser an extension of time to file her notice of appeal. *Kreiser v. Peevely*, No. 1471-24-4 (Va. Ct. App. Sept. 30, 2024) (order). We accordingly deny Peevely's pending motion to dismiss.

will was not in the possession of the testator and not accessible to [him], then a presumption of loss arises." *Johnson*, 262 Va. at 43. This places the burden on the opponent to show "by clear and convincing evidence that the will was revoked by the testator." *Id.* Thus, which presumption applies "depends on the threshold factual determination of whether the will was in the possession of the testator at death and, if not, whether the testator nevertheless had access to it prior to death." *Id.* at 43-44.

Whether the circuit court applied the correct legal standard is a question of law that we review de novo. *Edmonds*, 290 Va. at 18. But whether a party has overcome these presumptions by clear and convincing evidence that the testator did not revoke his will is a question of sufficiency of the evidence. *Id.* "We will only reverse a judgment for insufficient evidence if it is 'plainly wrong or without evidence to support it.'" *Glynn*, 77 Va. App. at 78 (quoting *Edmonds*, 290 Va. at 18).

Here, we need not determine whether the circuit court properly applied the presumption of loss because, even assuming that the presumption of revocation applied, we find that the court was not plainly wrong to find that Peevely had overcome it by clear and convincing evidence.[5]

Clear and convincing evidence is "that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established." *Id.* (quoting *Brown*, 225 Va. at 637-38). In this case, the evidence established that in July 2019, sudden flooding caused water to pour into the Vienna house's downstairs rooms "like a waterfall." Once the water receded, numerous items, including papers, had to be discarded because they were

---

[5] "When a lower court's judgment is made on alternative grounds, this Court need only determine whether any of the alternatives is sufficient to sustain the judgment." *Castillo v. Loudoun Cnty. Dep't of Fam. Servs.*, 68 Va. App. 547, 574 n.9 (2018). "[T]he doctrine of judicial restraint dictates that we decide cases 'on the best and narrowest grounds available.'" *Butcher v. Commonwealth*, 298 Va. 392, 396 (2020) (quoting *Commonwealth v. White*, 293 Va. 411, 419 (2017)).

- 10 -

"ruined" and unidentifiable. Many of the items disposed of were "all gummed up together" and "had to be scooped up with shovels." Later efforts to address the water damage to the house revealed the presence of asbestos, requiring the house to be emptied of "all" its furnishings and contents for additional remediation. Taken in the light most favorable to Peevely, this circumstantial evidence provides two likely explanations for how Eric's will was lost.

But even if we consider only Eric's testamentary intent, as evidenced "by the consistency of his mental attitude towards his various relatives," *Jackson v. Hewlett*, 114 Va. 573, 581 (1913), the evidence still supports the conclusion that, "whatever may have happened to [the will], the testator did not revoke it," *Edmonds*, 290 Va. at 20 (quoting *Jackson*, 114 Va. at 580).

Eric developed and maintained a "close relationship" with Thomas's family, including Peevely and Karen, their son and daughter, and Thomas's other nephew. He executed a will and trust agreement leaving most of his estate to Thomas's niece and nephews. In 2009, he told Peevely and Karen about his estate plan and assured them that their two children would be "well taken care of." Eric attended the 2014 wedding of Thomas's niece and often spent vacations and holidays with Thomas's family. After Thomas's death in 2020, Eric's relationship with Thomas's family continued. According to every witness, Eric never expressed any intent to change, revoke, or destroy his will. And, in 2021 and 2022, just months before his death, Eric affirmed to his attorney and Hoover that his desire was for his estate to pass to Thomas's niece and nephews, even showing a copy of the 2008 will to Hoover.

Eric's relationship with his own family was less sunny. He never mentioned them to Karen or Peevely and told Hoover that his family had "abandoned" him because he was gay. When he needed a place to live upon returning to Virginia in 2019, he sought out Kreiser, who "conditionally agreed" to let him stay with her. But Kreiser did not trust him "in certain aspects of life," describing him as an alcoholic and a "mean drunk." For whatever reason, Eric stayed with her only for about

three months before leaving to live in hotels and ultimately moving into the Vienna house after Thomas's death. Eric had a "poor relationship" with his mother, and when he visited her shortly before she died, she did not recognize him and told him to leave. And, although Kreiser asserted that she and Eric "knew what was going on with each other," he did not tell her about his will or selling the Vienna house. Moreover, unlike Thomas's family, she never vacationed with him, nor did they spend holidays together, and she only stayed with him once in Florida.

So, from prior to executing his will in 2008 until his death, Eric maintained a close relationship with Thomas's family, participating in their lives and allowing them to participate in his. But, during those same years, Eric had a distant relationship with Kreiser and the rest of his family. Taken in the light most favorable to Peevely, this evidence supports the circuit court's finding that Eric "maintain[ed] his testamentary intent as set out in the 2008 will" and that, whatever became of the original will, he did not revoke it. *Cf. Edmonds*, 290 Va. at 20.

Finally, when Eric discovered that he could not find the original or copies of his will and trust agreement, he was "very concerned" and confirmed to Hoover and his attorney that his testamentary wishes remained unchanged. Eric obtained copies of those documents and stored them with other important papers, where Kreiser found them after his death. If Eric had intended to revoke his will "by destroying the original, it would have been logical that he would have removed the photocopy from his file of important papers." *Id.* at 25. But, not only did he keep the copies, he took them out and showed them to Hoover just months before his death in 2022. Thus, Eric's actions are "inconsistent with" someone who has revoked his will. *Id.* at 26.

Taken together, the evidence supports the circuit court's determination that Peevely proved, by clear and convincing evidence, that Eric did not revoke his will. Thus, assuming without deciding that the presumption of revocation applied, we find that the court did not err, and we affirm its judgment admitting the copy of Eric's will to probate.

- 12 -

CONCLUSION

For the foregoing reasons, the circuit court's judgment is affirmed.

*Affirmed.*