## JOHN W. SUTHERLAND &C. V. CLARENCE LEWIS SUTHERLAND.

September 5, 1951.

Record No. 3804.

Present, Eggleston, Spratley, Buchanan, Miller and Whittle, JJ.

The opinion states the case.

*Perkins, Battle & Minor* and *Emmerson G. Spies,* for the appellants.

*Edwin H. Copenhaver* and *E. V. Walker,* for the appellee.

WHITTLE, J., delivered the opinion of the court.

On December 9, 1949 Clarence Lewis Sutherland filed a bill in chancery in the Circuit Court of Albemarle county under Code, § 64-84, praying that an unsigned copy of a will be set up and established as the last will and testament of Sally Jane Sutherland, "that said will having been duly made and signed, * * * was never destroyed by the said Sally Jane Sutherland, with intent to revoke the same, and was never otherwise revoked by her, but on the contrary the same was in legal existence at the time of her death and constituted her true last will and testament."

Complainant joined as respondents to the bill his three brothers, John W. Sutherland, R. Goodloe Sutherland, Nat. G. Sutherland, and his sister, Maxine Sutherland Beams, the parties to the suit being the only children of Sally Jane Sutherland, deceased.

R. Goodloe Sutherland and Nat G. Sutherland did not answer the bill, it being suggested that they had settled with complainant.

John W. Sutherland and Maxine S. Beams filed a joint answer denying all material allegations in the bill and praying for its dismissal.

The court empaneled a jury to hear the evidence on an issue out of chancery and directed that they answer two questions: (1) Whether the true last will of the said Sally Jane Sutherland

has been lost, destroyed or suppressed, and (2) What was her true last will and testament.

After hearing the case the jury answered these questions as follows:

"We, the jury, find that the will of Mrs. Sally Jane Sutherland was destroyed by some unauthorized person,

"We find that the copy of a will presented to this court and marked Exhibit 'A' is a copy of her true last will."

By decree entered on the verdict May 11, 1950 it was adjudged that Mrs. Sutherland died testate on the 28th day of June, 1945, and that her true last will and testament was exhibit "A".

The important provisions of the will, exhibit "A" were: That all debts be paid; the children to have the personal property, the piano going to Mrs. Beams; that Lewis and Nat should have the farm subject to a charge against it of $1250 for each of the three remaining children. There was a provision that if Nat did not elect to live on the farm he should have a charge against it of $2,000. Lewis was named executor.

Exceptions were duly taken and an appeal was granted by this court. The assignments of error are as follows:

I. The trial court erred in giving instruction "G" offered by appellee.

II. The trial court erred in not giving instruction No. 2 offered by appellants.

III. The findings of the jury and the decision of the trial court are contrary to the law and evidence.

The record in this case discloses the following: That sometime prior to April 6, 1923 R. A. Sutherland died intestate. At the time of his death he owned a large farm in Albemarle county. Mr. Sutherland left surviving him his widow, Sally Jane Sutherland, and the five aforementioned children.

On April 6, 1923 the five children joined in a deed conveying the farm to their mother.

The mother and children lived on the farm for a time after Mr. Sutherland died. John, the eldest son, moved away in 1925 to take a job in Kentucky. In 1924 Goodloe, the second son, accepted a position near Lynchburg, about 50 miles from home. Maxine married Dr. Beams, a professor at the University of Virginia and moved to Charlottesville, twelve miles distant. Lewis and Nat remained at home with their mother and "Miss Ida" their aunt. Lewis did most of the farming and Nat, the

youngest son, attended to the work around the house. On occasions he worked at a near-by machine shop. He faithfully cared for his mother and aunt, who were infirm.

Forrest Taylor, an attorney of the Staunton bar, was a friend of the Sutherland family. He was a very close friend of Lewis, whom he met in "the early thirties". Taylor was a frequent visitor in the Sutherland home.

On one of these visits Mrs. Sutherland suggested to Taylor that she would like for him to write her will. The will was prepared and delivered to Mrs. Sutherland by Taylor in the fall of 1935. It was signed by Mrs. Sutherland and duly witnessed in the early part of 1936. The fact that the will was duly executed and left in the possession of the testatrix is not denied.

Mrs. Sutherland died on June 28, 1945, approximately ten years after the execution of the will. A diligent search was made after her death and no will was found. Under the facts the presumption arises that the testatrix destroyed the will *animo revocandi.* " 'But this presumption is a presumption of the fact and can be rebutted by satisfactory evidence, showing the existence of the will at the time when the testator was incapable of revoking it, or satisfactorily showing its destruction by some unauthorized agency. The evidence must show not that the will might have been in existence at a time when the testator was incapable of revoking it, but that it was in existence at that time. And so, too, it is not sufficient to show that the will might have been destroyed or stolen without the authority of the testator, but the evidence should show, with some clearness, the fact relied on; for a court of equity does not set up lost papers except where it is clearly shown that it should be done, and courts of probate are not less strict.' " *Tate* v. *Wren,* 185 Va. 773, 783, (quoting from Wills and Administration, Harrison, Vol. 1, page 257), 40 S. E. (2d) 188.

Different phrases have been used by the courts to describe the character of proof necessary to overcome the legal presumption of revocation in cases of this kind, such expressions as "conclusive proof", "the clearest and most stringent proof", and other combinations of words having similar meaning. We feel that these various phrases reach the same point, which is for the evidence to be sufficient to overcome the presumption it must be clear and convincing leading to the conclusion that the will was not revoked.

The verdict of the jury on an issue out of chancery while ordinarily persuasive is not binding upon the court. (7 Michie's Jur., Equity, § 145, p. 178.) It differs from an issue *devisavit vel non* under section 64-84 of the Virginia Code.

Instruction "G" which is the basis of assignment of error No. I reads as follows: "The court instructs the jury that in this case the jury is not called upon to consider whether or not Mrs. Sally J. Sutherland was capable of making a will, or whether she was unduly influenced in the matter. There is no evidence tending to show incapacity at the time she is alleged to have made the will, and no evidence of undue influence. What the jury is called upon to decide is contained in two questions, namely:

"*First:* Whether the true last will of the said Sally J. Sutherland has been lost, destroyed or suppressed, and

"*Second:* What was her true last will and testament."

This was the crucial instruction in the case, the premise on which the questions are submitted was not in issue, no question of testamentary capacity had been raised and no suggestion of undue influence was in the case. This instruction nowhere suggests the nature of proof required to rebut the strong presumption that the will had been revoked. The fact that another instruction told the jury the character of proof required did not cure the defect. The verdict shows that the instruction did not make clear to the jury the real issue because they found that the will had been destroyed by some unauthorized person when there was no evidence upon which to base such a finding.

The law presumes that the testatrix destroyed the will *animo revocandi* and the vital question was whether the evidence was sufficient to overcome the presumption.

As this case will be decided upon the question raised by assignment of error No. III it will not be necessary for us to consider assignment No. II (the court's refusal to give appellants' instruction No. 2 as offered).

Assignment No. III challenges the findings of the jury and the decision of the trial court as being contrary to the law and evidence.

Appellee introduced ten witnesses in an effort to overcome the presumption of revocation. Only three of these witnesses are of value to the issue, namely, Mrs. Ponton, Bellefield Loving

and appellee. We will discuss their evidence later, and will take the other witnesses in the order of their appearance.

Forrest Taylor tells of writing the will. Reverend Powell testified to having helped Lewis and Nat search for the will. Mrs. Bessie Sutherland and Boyd C. Sutherland witnessed the will early in 1936. It is admitted that the will was so executed and left in the possession of Mrs. Sutherland. Nat G. Sutherland testified that his mother told him she had executed her will and put same in a wooden box in her trunk, she told him this several times; he had never seen the will and knew nothing of its contents; he attended his mother when she was sick, cooked for the family and ran the house; he helped Mrs. Ponton dress his mother before she left for the hospital.

M. Y. Sutherland testified that he had known the family all his life, that he did not know of the existence of the will and had never read it. He further stated that from his knowledge of the family and the property he knew of no reason why "she should not have made the will that was read here in court * * * or any reason why she should have revoked it after she made it".

Will A. Carpenter testified to the same effect as did Mr. Sutherland. We are not here passing upon the admissibility of this evidence.

Mrs. Lila W. Ponton, a widow, aged forty-six, moved to the community the latter part of August, 1944. She became acquainted with the Sutherland family and frequently visited in the home which was a mile from where she lived. She testified: "Well, I went to help them when I could. They were both (Mrs. Sutherland and Miss Ida Sutherland) ill and Nat did practically everything that was done in the house, and I went and I would help with the work. * * * Well, after I got to know her very well she would often speak of her property and how she had left it, the way she wanted it left, * * * She said she had her will made. * * * I knew she had it and I was always under the impression it was in the trunk. Whether she actually told me it was in the trunk * * * or I assumed that I don't know, but I was always under that impression, and she always said she wanted Lewis and Nat to have the home place but she had provided for all of the children, but they had stayed there and done for her and she wanted them to have it. * * *

"Q. Were her children devoted to her?

"A. Yes, sir, I am sure they were, but I feel like the two boys at home, I saw so much more of them. Nat was as gentle and careful with her as any woman could be, and to Miss Ida too. * * *

"Q. Did Mrs. Sutherland ever show you the will?

"A. No, sir, I did not see it.

"Q. Did she ever tell you its contents other than what you have stated already to the jury?

"A. No, sir, I don't think so."

Mrs. Ponton further stated that the day Mrs. Sutherland left for the hospital "she said she had everything straight, just like she wanted it. She went in the trunk that day to get something she needed. I took her across and she sat in a rocking chair and opened the trunk herself but she didn't get any papers or anything of that kind out, just small articles of clothing, her hose and things, that she got out of the trunk. * * *

"Q. She didn't say anything about 'my will is here'?

"A. No.

"Q. She was in the trunk and didn't make any mention of it?

"A. No, she didn't. She wasn't interested in that at that time but before that she was asking about everything and we told her everything would be all right and she said 'I won't have to worry'.

"Q. She felt things were in good shape?

"A. She felt like all the legal things were taken care of.

"Q. You are guessing that?

"A. I am guessing that, yes."

Bellefield Loving, a Negro who had worked for appellee since 1940, testified: * * * "So one day she was sitting there and she was telling me about what nice hogs they had, what a good farmer Mr. (Lewis) Sutherland was, and she said, 'I have already made my will. I got Mr. Taylor to write my will and I got Miss Bessie and Mr. Jinks to sign it and got it fixed so Mr. Nat and Mr. Lewis will pay the others out and they will have the farm to suit themselves.'

"Q. About when did that conversation take place?

"A. Well now, she told me that several times, but the last time I can remember her telling me this it was the last year we killed nine hogs and that was in '44, in December."

Lewis Sutherland (appellee) testified that he knew Taylor had written the will and that, at the request of his mother, he

invited the subscribing witnesses to the house,— "* * * I stopped by and told them Mama wanted to see them. It was a cold, rainy evening. That evening they came up there. * * * I was in the adjoining room. * * * Well, I was fooling around and made a little memorandum on a piece of paper. I don't know why I did it or anything, and it was the 25th day of March * * * 1936."

Lewis further says that he made this memorandum while the will was being executed, that "the reason I know that, I cleaned my desk out sometime ago and run across it". He stated that this memorandum helped him to be specific about the date,— "Yes, sir, because if I hadn't had that I wouldn't have known the date, except it was in the spring time."

Appellee further says that he read the will before it was signed and knew its contents; that he never saw the will after it was executed in 1936 but that he had seen an envelope marked "My Will" on several occasions "in her trunk"; that "every time she would get sick she would tell me where it was." He says "the last time I saw it (the envelope) * * * was in October or November, I won't say which month, but it was a cool, rainy day in the fall of the year, because I had a fire. * * * That was in '44."

This witness further testified that on the day Mrs. Sutherland died Doctor and Mrs. Beams came to notify them of their mother's death, "and she (Mrs. Beams) said to me 'I have been in there looking in Mama's trunk for some clothes'. She didn't have any clothes in her hands. She didn't have anything but her pocketbook, and we sat down and talked for a while."

Appellee tells of calling the minister, their unsuccessful search for the will, of his later visit to Forrest Taylor who ultimately found an office copy of the will, and the filing of the suit after the copy was found.

No other witnesses were introduced on behalf of appellee.

The appellant, John W. Sutherland, testified in his own behalf and R. Goodloe Sutherland was called as a witness. Appellant, Mrs. Beams, was ill and did not testify.

Goodloe Sutherland testified that his mother told him in July, 1941 that she had a will but that she did not like it and had burned it; that after Mrs. Sutherland told him this he suggested, "Maybe you have a copy. She said 'I don't know anything about it but I don't have the will that these two people witnessed, B. C.

Sutherland and Bessie Sutherland'. Said, 'I have destroyed it'."

John Sutherland states that he had never heard of his mother's will; that the first discussion of the will he recalls was about March 1, 1950 when Goodloe stated to him that he had been told by his mother in 1941 that she had a will but had destroyed it.

It was suggested that the evidence of Goodloe Sutherland regarding the reference to the copy of the will makes his evidence unworthy of belief. The same suspicion could be directed to Lewis' testimony regarding the "memorandum", and the fact that "cold, rainy days" seem apparently to refresh his memory.

Appellants have no burden to carry in this case, the burden is upon appellee. Appellee's case must stand or fall upon his own evidence, that of Mrs. Ponton and the evidence of Bellefield Loving.

Mrs. Ponton never heard of the Sutherlands until she moved to the "Cross Roads" the latter part of August, 1944. Mrs. Sutherland went to the hospital in February, 1945 and died there in June of that year. Mrs. Ponton never visited her while in the hospital, yet she tells of prior intimate conversations had with Mrs. Sutherland. If her evidence is to be taken at face value we must believe that Mrs. Sutherland told this acquaintance of five months things regarding her will which she had not divulged to some of her own children.

When we come to the evidence of Bellefield Loving we must consider that this man had worked for Lewis Sutherland for ten years and was in his employ at the time he testified. His statement, to say the least, loses weight when he says, "Well now, she told me that several times." He says Mrs. Sutherland told him who wrote the will, the names of the subscribing witnesses, and just what the will provided. Mrs. Sutherland may have told Bellefield this on one occasion, but why would she tell him "several times"? Suppose, however, Mrs. Sutherland did tell him "several times", he says the last time she told him was in "December '44". She had ample opportunity after this date to destroy the will. So the evidence, if accepted, becomes of little value.

The same comment can be made as to the testimony of appellee. The last time he recalls seeing the envelope inscribed

"My Will" was many months before his mother went to the hospital. Mrs. Sutherland had ample opportunity after this to destroy the will if she had not destroyed it before.

There are many factors entering into this case. This will was executed in the early part of 1936. So far as the record shows no one has seen the actual will since its execution.

At the time the will was executed Mrs. Sutherland evidently felt that she had dealt with her children equitably. They had given her their interest in the place after their father's death, and she had provided in the will what she believed at the time was a proper charge against the property for the three children who had moved away, thinking no doubt that they were not interested in owning a part of the farm and the money would be more acceptable to them. Nowhere in the record is it suggested that this good mother desired to prefer one child over another except the very natural difference she had made in favor of Nat in the event he did not care to remain on the farm after her death. There is abundant proof that she loved all of her children and that they loved her.

At the time the will was executed its provisions were fair. At that time this country was emerging from a severe depression. Farm products and farm lands were at a very low ebb.

In 1945 the value of farm lands had increased materially. It is reasonable to assume that Mrs. Sutherland realized this and felt that the equitable will made in 1936 was no longer fair and therefore destroyed it.

It is a matter of common knowledge that wills are often lodged with trust companies and attorneys who systematically advise their clients of the changes in laws and property values which subsequently affect wills left in their possession. New wills are often made, codicils added, and many wills are intentionally revoked.

Who would have been interested in doing away with this will except Mrs. Sutherland who had the legal right to destroy and revoke it? John was in Kentucky, there is no suggestion that he destroyed it. Goodloe was in Lynchburg, fifty miles away, and there is no shadow of suspicion cast on him.

This leaves Mrs. Beams, the daughter, who lived in Charlottesville. She came home to bring the news of the mother's death to her two brothers. When Lewis, who was working in the field, was informed by Dr. Beams of his mother's death, he came to the

house and Mrs. Beams told him that she had been in her mother's trunk looking for clothing, evidently to be used for the burial. Lewis stated that Mrs. Beams did not have any clothes in her hands, that she only had her pocketbook.

Mrs. Beams voluntarily told Lewis that she had been in the trunk, he would not have known it otherwise. Had she taken the will, it is highly improbable that she would have made the confession that she had been in the trunk. In Virginia, Code, § 18-271 makes it a felony for a person to fraudulently "destroy or conceal any will or codicil with intent to prevent the probate thereof * * *".

The bill charges that the will "was never destroyed by the said Sally Jane Sutherland with intent to revoke the same." It makes no charge that Mrs. Beams destroyed it.

Appellee relies upon the facts in two Virginia cases to demonstrate how he has met the burden imposed upon him under the law of Virginia, i. e., *Jackson* v. *Hewlett*, 114 Va. 573, 77 S. E. 518, and *Bowery* v. *Webber*, 181 Va. 34, 23 S. E. (2d) 766. Appellee argues, "The *Webber Case* was apparently decided (favorably to the proponent of the will) by comparing the facts with those in the former (Hewlett) case. Therefore, if the facts in the case at bar can measure up to either of the cases last referred to, there is no necessity of defining the measure of proof required in such cases, nor any need to consider any of the cases cited by the appellants which antedate the *Hewlett Case*."

In our opinion the facts in both the *Hewlett Case* and the *Webber Case* were clear and convincing. We cannot say that the facts in the case at bar "can measure up to either of the cases."

The facts in the *Hewlett Case* show that the testator made declarations anterior to the will, coincident with it and subsequent to it. These declarations clearly show an avowed purpose to leave his estate to his illegitimate daughter, Gertrude Jackson, and not to leave it to his daughter, Mary P. Brown. Just a few days before his death he reiterated this purpose and said that his will was in his bureau drawer. His intention persisted all the time without change. (See 114 Va., pp. 576, 577.)

The evidence in the *Webber Case* discloses the deep affection of the testatrix for the beneficiary, her adopted granddaughter, whom she had reared from infancy. This affection continued over a long period and down to the death of the testatrix.

Repeated declarations of the testatrix subsequent to the making of the will and only a short time before her death showed that the will had been made, and was in her possession, that she desired her granddaughter to have her property, and that she had no affection for appellants and did not want them to share in her estate. (See 181 Va., pp. 36-38.)

The court held in these cases that the evidence was sufficient to overcome the presumption of revocation.

The net result of the facts in the case before us is that in 1936 Mrs. Sutherland had a will. It was not found after her death in 1945. What became of the will is not established. There is some evidence tending to show that she frequently mentioned a will. She remained in the hospital more than five months before her death and there is no intimation that she ever referred to her property or to a will while there. There is evidence that in 1936 the will made an equitable disposition of her estate. The same will in 1945 would not have been equitable.

The record shows that Mrs. Sutherland held a deep affection for all of her children and this affection was reciprocated. There is no suggestion that she preferred one child over another.

There is a strong legal presumption that the testatrix destroyed the will with the intention of revoking it. To overcome the presumption of revocation the burden is upon appellee. He must produce evidence which is clear and convincing to do this. We do not have this character of proof before us here, and we cannot relax the character of proof required in cases of this kind.

In view of what we have said it follows that the decree must be reversed and the bill dismissed.

*Reversed and dismissed.*