**Richmond**

PHILIP S. JESSUP, II, AND ELIZABETH H. JESSUP SMITH

v.

CLAUDE A. JESSUP, ET AL.

June 6, 1980.

Record No. 780827.

Present: All the Justices.

Daniel W. Coon [D.C.] (Edmund D. Campbell; David H. Cox [D.C.]; Jackson, Campbell & Parkinson, on brief), for appellants.

Jay T. Swett; Jane L. Schwarzschild; George W. Farley; Thomas J. Michie, Jr. (Robert H. Patterson, Jr.; John S. Davenport, III; John V. Little; Junius R. Fishburne; Lloyd T. Smith, Jr.; George B. Barrett; J. Harry Michael, Jr.; John W. Zunka; Lewis A. Martin, Jr.; McGuire, Woods & Battle; Mays, Valentine, Davenport & Moore; Michie, Hamlett, Donato & Lowry; Richmond & Fishburne; Tremblay & Smith; Michael & Dent; Taylor, Brooks, Zunka & Murray, on briefs), for appellees.

No briefs or arguments for India Jessup Richards, an infant; Mary Catherine Cella, an infant; Harrison Price Jessup, Jr., an infant; and John S. Battle, Jr., Executor of the Estate of Betty Sue Jessup, appellees.

HARRISON, J., delivered the opinion of the Court.

This appeal involves the validity of an order of the clerk of the court below, subsequently affirmed by that court, admitting to probate a holographic instrument dated August 1, 1960, as the last will and testament of Betty Sue Jessup, deceased. Plaintiffs, Philip S. Jessup, II, and Elizabeth H. Jessup Smith, are among the heirs-at-law of the decedent, they being two of the children of her deceased brother,

Philip Jessup. The defendants are the executor of the decedent's estate, her other heirs-at-law, and those persons identified as possible legatees under the holographic instrument mentioned above.[1]

Plaintiffs allege that the August 1, 1960 writing is not a valid will for the reason that it fails to manifest sufficient finality of intent, does not contain the essential dispositive provisions and, even if properly executed, was subsequently revoked by mutilation. Upon a trial of the case, the court below refused to admit certain evidence proffered by plaintiffs, struck their evidence, and dismissed plaintiffs' complaint *devisavit vel non*.

Betty Sue Jessup died on June 7, 1976, following a hospitalization period of two months. Her estate is alleged to have a value in excess of one million dollars. On July 12, 1976, two paper writings, the above one dated August 1, 1960, and the other, a "memo," dated September 15, 1973, from the decedent to Lucy Ann P. Cella, her niece, were probated in the Circuit Court of Albemarle County as the last will of the decedent. It is stipulated that both writings are entirely in the handwriting of Miss Jessup. The testamentary capacity of the decedent to make a will is admitted.

The August 1, 1960 writing was found in a small (6″ x 9″) notebook with a blue cover. The first page of the book is neither numbered nor lettered, but on it is printed the word "Will." The back of the first page is completely blank except in the top left corner is

---

[1] John S. Battle, Jr., qualified as executor of decedent's estate. It appears from an exhibit filed with the bill of complaint and from the responsive pleadings that Betty Sue Jessup died unmarried and without issue, survived by two living brothers, Claude A. Jessup and James L. Jessup, and the heirs of a deceased sister, Lucy Jessup Parker, and a deceased brother, Philip Jessup; that the nieces and nephews of the decedent are Claudia Jessup Richards, born 1943, the daughter of Claude A. Jessup, James L. Jessup, Jr., born 1951, and Helen Jessup Staton, born 1952, the children of James L. Jessup, Lucy Ann Parker Cella, born 1929, and Samuel Winfrey Parker, born 1931, the children of Lucy Jessup Parker, Harrison Price Jessup, born 1938, Philip Samuel Jessup, II, born 1945, and Elizabeth H. Jessup Smith, born 1948, the children of Philip Jessup; that the grandnieces and grandnephews of the decedent are India Jessup Richards, born 1974, the daughter of Claudia Jessup Richards, Paul Winfrey Cella, born 1954, Caroline Parker Cella, born 1957, and Mary Catherine Cella, born 1970, the children of Lucy Ann Parker Cella, Samuel Edwin Parker, born 1958, the son of Samuel Winfrey Parker, and Harrison Price Jessup, Jr., born 1973, the son of Harrison Price Jessup. India Jessup Richards, Mary Catherine Cella, and Harrison Price Jessup, Jr., all infants, were represented by appointed guardians *ad litem*. The plaintiffs' bill of complaint was taken for confessed as to Claude A. Jessup, James L. Jessup, Samuel Winfrey Parker, Samuel Edwin Parker, Lawrence R. Burruss, Gordon A. Durham, C. Frank Hooper, Nellie Thomas, Edward M. Desmond, and Carter L. Martin.

written "Page 1(a)." Thereafter three pages were torn and removed from the book. These pages have not been found, and there is no evidence showing when and under what circumstances they were removed. The writing begins on page 4 and reads as follows:

Page 4.

*Special Instructions To Executors:*

I want No argument, dissension, unpleasantries nor "bickering" about my estate. ~~I am in my right Mind--I know what I own and have evidence in my records to prove it--~~I leave it to the sole discretion of my appointed Executors to decide upon any question about properties which might have been willed to beneficiaries which might have died prior to my death and which I might have neglected to correct on the (a) side of the page referring to such bequeaths or properties which I might have disposed of, otherwise, prior to my death. In case of such properties, either sold or given away, which I might have failed to "note" on the (a) side of the page, Executors are advised, here and now, that such item or items of property be forgotten about and Excluded from any Beneficiary Named herein, without question. It is quite possible and probable that I will have disposed of in some way—In the coming years—Some of the Items of property bequeathed herein—In such case or cases, the bequeath herein becomes null and void the moment I dispose of such properties, whether or not I remember

Page 5.

to make such correction on the (a) side of the page referring to such items.

It is my will that Executor or Executors notify all beneficiaries at the very outset that peace and quiet must prevail in the distribution of my propetries. . . And that

(1) Should Any Individual, among my beneficiaries, raise an argument about any part of my properties and/or Belongings— That individual's NAME Shall Be Automatically EXCLUDED from this Will throughout and whatever I have willed him, or her, shall be distributed equally among The Charities listed in *GROUP 1* on the last page of This Book. IF such items be other

than Money, such item or items shall be PRIVATELY sold and money received Therefor shall be distributed among Charities listed in Group 1 on last page of This Booklet.

NOTE: On the last page of This booklet, which is my last Will, I shall list my favorite Charities in certain Groups which will be referred to from Time to time herein.

(OVER)

Page 6.

(2) There shall be NO Public Auction Sale of Any of My Properties or belongings. If, at the time of my death, I own properties—or Any Type of belongings—which are not mentioned herein—such items shall be sold privately, and without publicity, and proceeds of such sales shall be distributed equally among all my GREAT NIECES AND NEPHEWS who may be living at that time. (IF SUCH PROPERITIES ARE wanted by any member of My Family, The Executors shall establish a fair market value and give the member of the family wishing to purchase such property a 20% discount therefrom—Cash Sale— Proceeds to be distributed as stated above. IF, however, such properties are sold to dealers or other outside individuals, They shall be ~~distributed~~ sold at a fair market value, proceeds to be distributed as above stated—

(2)(a)—Parents of Great Nieces and Nephews whose children receive proceeds of such sales are to use proceeds (and any income thereof, (if invested) for Education of such nieces and nephews—"Great" that is. If,

Page 7.

however, any of such Great Nieces and Nephews shall have become of age and have completed their education, such proceeds shall go to them with no strings tied.

Great Nieces or Great Nephews who may be born within six months after my death shall share equally with those now living

**(3)** *My Debts To Others—*
Must, Naturally be paid—Normally, my accounts payable will be on a current basis and any bills due will be with my check book—There might be Note payable but the Banks will let themselves be heard.

**(4)** *Debts of Others To Me—*
I want every debt owed to me by anyone whom-so-ever—cancelled on the date of My death—The people I have helped—Mostly employees in Charlottesville and at Branch Plants are too Numerous to remember—Mostly I have made straight loans with No Notes But, if there are any Notes due me—cancel them—

Any furniture which I have lent to anyone, and is at the time of this reading, in their possession—May remain their property—By way of explanation, If I have ever done anyone a

favor—or helped anyone financially on a hospital Bill or Home Care, or what-so-ever—It was because I derived pleasure from being able to help and I want NO ONE to be obligated in any way to my Estate.

**(5)** *My Common Stock In Monticello Dairy, Inc.*
Since I can't finish this at one sitting, I touch on This Stock First as it is my major concern—I want the Voice in operating The Company to remain among those who have helped me through trying spots and who have the experience and ability to carry on.

As you, John Battle, will remember—Dad wanted Ten Shares of stock issued to Lawrence R. Burruss for his contribution to the success at a time When We were without Executive personnel material—This Stock was actually

issued and, later, cancelled for tax reasons—and promised at a later date when something could be worked out (I think

George Gruber said that L.R.B. could not afford to own it for Tax reasons and I *think* your reason, John, for advising Dad against it was connected with market values) Anyway, Dad intended for him to have it and, if such arrangements have not been made, I would like him to have 10 shares of my Stock—(ten)—I would

[At this point a paragraph measuring approximately two inches was cut out of the page.]

(6) *For Local Employees of long Service.*

|  |  |
|---|---|
| Will Durham | $5,000.00 |
| Frank Hooper | $5,000.00 |
| Nellie Thomas | $1,000.00 |
| Snuffy Pace | $5,000.00 |
| Lelia Vest | $2,000.00 |

Page 11.

|  |  |
|---|---|
| John M. Desmond | $5000.00 |
| Carter Martin | $5000.00 |

I haven't time to write more now—Will resume later—

By the way—I want Jimmie Jessup to have my Pepsi Cola Stock—

Will resume later

Signed—August 1, 1960
s/s Betty Sue Jessup

The backs of pages 4, 5, 6, 7, 8, 9, and 10 are numbered 5(a), 6(a), 7(a), 8(a), 9(a), 10(a), and 11(a), respectively, and are completely blank except for the numbers found in the top left-hand corner. The back of page 11 is unnumbered and blank as are the remaining pages in the book.

The "memo" to Lucy Ann P. Cella, also probated as the will of the decedent, reads as follows:

Betty Sue Jessup

MEMO TO LUCY ANN CELLA:

File this away in case it might be needed before I record provisions in some other way—

I have promised Caroline Cella that at such time that my Doll Collection must be disposed of—She shall become the Sole owner of the Collection

(OVER)

except for any exceptions that I might have noted on any individual item to indicate otherwise—

By this I mean that it is possible that I might want to give some doll Back to the person who gave it to me in the first place—This is, at this time, not probable—But possible—

Otherwise, the whole Collection shall be considered as "ONE PACKAGE LOT"—to Belong to Caroline Cella, now of Powhatan, Virginia—

Signed By my hand this 15th Day of September—1973

s/s Betty Sue Jessup

Upon a trial of the case in the court below a jury was impaneled, and the parties stipulated that the August 1, 1960 writing and the September 15, 1973 "memo" be introduced in evidence. The proponents of the will then called Lawrence R. Burruss, Executive Vice President of the Monticello Dairy, Inc., a close personal friend and a business associate of the decedent. Mr. Burruss testified that he made a number of visits to the decedent during her last illness. He said that during one of these visits she requested that he obtain from her private office certain documents and told him where they would be found. Burruss said that they were found lying on an open shelf underneath a ledger book, along with "tax papers," etc. The documents he removed from the office were the August 1, 1960 writing and another writing dated January 19, 1963, hereinafter set forth. The witness said that he placed the documents and four or five blank books of a similar nature in a manila folder, took them to the hospital, and left them on the nightstand beside the decedent's bed. He did not discuss the contents of the documents with the decedent at that time or at any time thereafter. Approximately two weeks later her brother, James Jessup, gave the documents to Burruss to be returned to the decedent's office for safekeeping. At the conclusion of Burruss' testimony the proponents of the will rested their case, and

the contestants made a motion to strike upon the same grounds as those alleged on this appeal. The motion was overruled.

The contestants then sought to introduce certain evidence which was objected to by the proponents.[2] The court sustained the objection and refused to admit the evidence. Thereupon, on motion of the proponents, the court held, as a matter of law, that the paper writings dated August 1, 1960, and September 15, 1973, constituted the last will and testament of Betty Sue Jessup and that there existed no triable issue of fact for the jury.

The contestants sought to introduce testimony that Miss Jessup was an exceptionally able, astute, and knowledgeable business woman who served as the chief executive officer of the Monticello Dairy and operated the business in a successful manner over a long period of years. The contestants attempted to introduce the evidence of Dr. and Mrs. Francis G. Langford, Jr., neighbors of the decedent. Dr. Langford is a former President of Longwood College. Mrs. Langford was a classmate of Miss Jessup at the College of William and Mary. The Langfords would have testified that at one time Miss Jessup had stated to them that she wanted to give them a lot that adjoined their property and said, "If I don't put it in my will, I'm going to leave a letter. . . ." Mrs. Langford said that several years before Miss Jessup died she heard the decedent say to her husband, "I suppose I should be thinking about making a will," and asked Dr. Langford, "Do you have any suggestions?" She said her husband suggested his own lawyer, Junius Fishburne, and another lawyer, Mortimer M. Caplin, both of whom Miss Jessup knew, but that Miss Jessup was not interested in having them "do the will," and never mentioned the matter again. Dr. Langford confirmed that the decedent asked him if he might suggest someone to make a will for her.

The contestants also sought to introduce in evidence an unsigned writing by the decedent, dated January 19, 1963, which Mr. Burruss found in the decedent's office at the time the August 1, 1960 writing was located. This January 19, 1963 writing is also contained in a 6″ x 9″ notebook. There is no legend or writing on the cover of the notebook or on the first page. On the back of the first page in the top left-hand corner is written "Page 1(a)." Thereafter follow three pages, which read as follows:

---

[2] All the testimony which the contestants would have introduced is contained in discovery depositions and was proffered.

January 19, 1963

*EXPLANATION:*

I have chosen to write this, My last Will and Testament in my own hand writing as I sit here in my office, in sound mind and good health, being considered mentally competent to operate this Business (Monticello Dairy, Inc., Branches and subsidiaries) of which I am President and General Manager.

Being very busy with responsibilities, both in business and management of the Family home—it will not be possible for me to complete this Will at one "sitting"—It will require weeks . . . . or Months . . . or, perhaps, years—Since it must be written in this Manner, I shall sign each section as I write in order that, in case of unexpected death or disability, no portion of the will will Be Unsigned.

Realizing that properties change and that named beneficiaries may be changed, because of death or other possible reasons, I shall write the main substance of my wishes (as they are at the time of each "writing") on the RIGHT-HAND sheets of this booklet as it lays on the desk before me—(In This Instance, *PAGE 1* I shall leave *Blank* the opposite sheet of each double page (in This Instance, *PAGE 1(a)*), as I write, in order that future *changes* or *corrections* may be made, thereon, as time goes on. Any and all such changes and/or corrections will be clearly stated with reference to the portion to be changed and dated and signed and will, at the moment signed by me, become my last Will and

*Page 2*

Testament—in that particular Instance—rendering NULL and VOID the portion of the Will referred to as changed by such amendments which amendments will be signed and dated by me on the opposite "(a) PAGE" of any Double Page in this Booklet.

*EXECUTOR:*

I name John Stewart Battle, Jr.,—Not The Law Firm But John as an individual and a Friend—as the executor of My Will

—I choose John as a friend who knows best my dislike of publicity and my desire to have my wishes carried out in the fairest possible way without argument or anything bordering on unpleasantries. I shall state my wishes as clearly as possible and leave it to the sole discretion of the appointed executor (or executors, in case I decide to name another at any time subsequent to this writing) to decide upon any question about my properties . . . . to interpret my written words, herein, and carry out my wishes to the best of his ability as he understands them—

> *NOTE:* On The Last Page of This Booklet, I List My Favorite Charities . . . In Certain Groups . . . Which Will Be Referred to from time to time—herein—

> It is my will that the named Executor keep my will as *private* and *confidential* as is legally possible and maintain all possible harmony. Toward this end it is my will that

> (1) Should any Individual, among my beneficiaries raise any argument about any part of my properties and/or Belongings, That individual's name shall be automatically Excluded

*Page 3*

from this will, throughout, and whatever I have willed to him (or her) shall be distributed equally among the charities listed in *Group 1* on The Last Pages of this Booklet. If such items be other than money they shall be Privately Sold and the proceeds shall be distributed equally among charities listed in *Group 1* on the last pages of this Booklet—

> (2) I prefer that none of my properties be sold at public Auction—Except as a very last resort—

The backs of pages 1, 2, and 3 are numbered 2(a), 3(a), and 4(a), respectively, and are blank except for the numbers found in the top left-hand corners. Pages 4 through 20 (and the backs thereof, pages 5(a) through 20(a)) are all numbered but are otherwise blank.

The contestants claim, *inter alia,* that the will of Betty Sue Jessup is invalid because of its failure to manifest sufficient finality of testamentary intent, and that the admitted mutilation of the will by the decedent was done with the intent to revoke it. Code § 64.1-58 provides that a will can be revoked ". . . by the testator . . . cutting,

tearing, burning, obliterating, cancelling or destroying the same, or the signature thereto, with the intent to revoke."

In *Franklin* v. *McLean,* 192 Va. 684, 66 S.E.2d 504 (1951), it was not disputed that the paper writing involved there, if not revoked, met the requirements of a holographic will. The issue there, as here, was whether the evidence showed, as a matter of law, that the will involved had been revoked in some manner required by Code § 64-59 (predecessor of Code § 64.1-58). Mr. Justice Eggleston, later Chief Justice, said:

> As is pointed out in *Thompson* v. *Royall,* 163 Va. 492, 497, 175 S.E. 748: "*** revocation of a will by cancellation within the meaning of the statute, contemplates marks or lines across the written parts of the instrument, or a physical defacement, or some mutilation of the writing itself, with the intent to revoke. ***"
>
> "It is generally agreed that if a will produced for probate, which is shown to have been in the custody of the testator after its execution, was found among the testator's effects after his death, in such a state of mutilation, obliteration, or cancellation as represents a sufficient act of revocation within the meaning of the applicable statute, it will be presumed, in the absence of evidence to the contrary, that such act was performed by the testator with the intention of revoking the instrument. *** Whatever presumption arises from acts of cancelation or mutilation is rebuttable, but the burden of the rebuttal rests upon the proponent." 57 Am. Jur., Wills, § 550, pp. 378, 379.

*Id.* at 689, 66 S.E.2d at 506.

In Black's Law Dictionary 919 (5th ed. 1979), the word "mutilation" is defined as follows:

> As applied to written documents, such as wills, court records, and the like, this term means rendering the document imperfect by the subtraction from it of some essential part, as, by cutting, tearing, burning, or erasure, but without totally destroying it. . . .

We cannot ignore the background of this case. We are dealing with an estate consisting of real property and of tangible and intangible personal property. The owner was an educated woman, the chief executive officer of a successful business enterprise, who obviously had a layman's knowledge of wills and their importance but of course

lacked drafting skills. We have no difficulty in concluding that when the August 1, 1960 document was written by Miss Jessup, it was an act on her part incident to making a testamentary disposition of her properties. It is equally as clear to us that what was written by the decedent was not intended to be complete and final. She intended to write more and said so. A critical question is whether what she did write had the finality of testamentary intent. Was the signature of the decedent affixed by her to indicate finality of intention to authenticate the concluded act of a partial disposition of her property, or was her signature simply an identification of the writing as hers and to make manifest that it was not a final act and that more was to follow? A further crucial issue is, assuming the decedent did intend a partial disposition when she signed her name on page 11 of the writing and dated it August 1, 1960, did she subsequently revoke and render the writing imperfect when she cut and tore essential parts therefrom?

"[I]t is not necessary to the validity of a will that it should have a testamentary form, or that the decedent should know that he had performed a testamentary act, or that he should intend to perform such act." *Henderson* v. *Henderson,* 183 Va. 663, 667, 33 S.E.2d 181, 182-83 (1945). The informal style of the writing can be explained by the fact that Miss Jessup had no legal training and was attempting to write a document she was ill-equipped to author. However, the imperfections, inconsistencies, and omissions in substance, of what remained after mutilation, cannot be so easily explained. They are numerous and must be considered in some detail.

1. Although Miss Jessup had a valuable estate, the settlement of which would be involved and complicated, she did not name an executor. Notwithstanding that she referred to the appointed executor or executors and gave them wide discretion, nowhere in the writing that remains does she name any person to administer her estate. We can surmise that her executor was named either in the first three pages that were destroyed, or that an executor would have been named had the decedent ever resumed the writing of the August 1, 1960 document. By reference to the January 19, 1963 writing, we can also surmise that the John Battle mentioned in the January 1, 1960 writing was not the former Governor of Virginia but John S. Battle, Jr.

2. The proponents of the will made no effort to show when and under what circumstances the decedent destroyed the first three pages of her will and cut therefrom a paragraph. The record is completely

silent on this. Arguably, these pages and paragraph contained specific devises and bequests for, in the "special instructions to executors" that followed the excised pages, the decedent often used the past tense and referred to *appointed* executor, property of which *might have been willed,* beneficiaries *named* herein, items of property *bequeathed* herein, the bequests herein, excluding from any beneficiary *named, whatever I have willed* him or her.

3. Nowhere in the writing do we find the usual and customary dispositive clauses, such as "I bequeath" or "I devise." In her "instructions" the decedent used precatory language only. She "instructed" her executors that she would "like" Lawrence R. Burruss to have ten shares of her stock; she "wanted" her brother James to have her Pepsi Cola stock. Clearly, at the time written, the decedent "wanted" the debts due her by others to be cancelled, and although the language to express the desire is imperfect, it also appears that in August 1960 she wanted the seven named "loyal employees of long service" to have the amounts set opposite their names.

4. The writing contains no residuary clause. To construe the first paragraph on page 6 of the writing as a residuary clause, as the proponents contend it should be construed, would indeed be a tortured construction. While there is a reference to properties and belongings, the decedent was referring to items which she may have overlooked and not bequeathed in her will, items of a kind and character usually sold to and by dealers. A direction that "any member of my family" have the privilege of purchasing land or stocks and bonds at a 20% discount of fair market value would have been the surest way of promoting the dissension and bickering which the decedent deplored and desired to avoid. Obviously the paragraph refers only to tangible personal property of the decedent which could have been of sentimental or practical value to her family.

5. The decedent failed to name any charitable organizations as a beneficiary of her will despite her expressed intent to list and name such charities. We can only speculate on whether any were named before the mutilation occurred.

6. The writing speaks of beneficiaries and members of her family, of whom there were many. Included in her immediate family were brothers, sisters, nieces, nephews, grandnieces, and grandnephews. Notwithstanding this fact, only one relative of the decedent (her brother James) is mentioned by name in the entire writing.[3]

---

[3] In *Neblett* v. *Smith,* 142 Va. 840, 849, 128 S.E. 247, 250 (1925), we quoted from *McDonald* v. *Ledford,* 140 Tenn. 471, 205 S.W. 312 (1918), as follows:

7. Mr. Burruss testified that the decedent had "two loves," her father and the Monticello Dairy. Although in the writing she referred to the stock in the dairy as her "major concern," she made no disposition of this stock, except to express a conditional desire for Mr. Burruss to have ten shares.[4] Apparently the paragraph she cut from page 10 of her alleged will concerned this stock.

8. When Miss Jessup decided to bequeath her doll collection to Caroline Cella, she did not add the bequest to the August 1, 1960 writing, as might have been expected in view of the blank (a) pages in the booklet, and her expressed intent to "resume later" the writing. The memo to Lucy Ann Cella makes no reference to any existing will of the decedent. On the contrary, there is a plain intimation in it that at some time, subsequent to September 15, 1973, Miss Jessup planned to "record provisions in some other way."

9. In the note found on page 5 of the August 1, 1960 writing, the decedent refers to the booklet in which she was writing as "my last will." It was in this booklet that the decedent indicated four times that the writing would not be completed in one sitting. On the last page the decedent wrote very little, but three times wrote that she had not finished. She said, "I haven't time to write more now," and "will resume later." And then, as if an afterthought, she made a note of the fact that she wanted her brother James to have her Pepsi Cola stock and again she wrote "will resume later."

Well-established principles decree that in construing a will we must seek to determine what the testator meant by what was said in the will. We look to the whole of the will and where possible give effect to all its provisions. *Spicely* v. *Jones,* 199 Va. 703, 706, 101 S.E.2d 567, 569 (1958). These same principles apply in construing a mutilated will. We must take the will as the testator left it and look at what remains. *Ruth* v. *Jester, Adm'r,* 198 Va. 887, 890, 96 S.E.2d 741, 743 (1957). The proponents of Miss Jessup's will contend that what is left of the August 1, 1960 writing is her last will and testament and was so intended by her. They say that the will does contain a residuary clause and that the will makes a complete and final disposition of her estate. In effect, the proponents say that

"We cannot hold that the rule that a testator is presumed to have intended not to die intestate as to any part of his estate is of greater force than the rule that an heir is not to be disinherited except by express words or necessary implication. ..."

[4] Burruss testified that there were 180 outstanding shares of the capital stock of the Monticello Dairy, Inc. He also testified that he was purchasing from the decedent ten shares for which he had given her his note in the amount of $50,000.

the will was not rendered imperfect by the mutilation thereof.

If the proponents are correct, then we must find from the four corners of the document that the decedent, in spite of her deliberate act of mutilation during which she completely destroyed three pages and an additional paragraph on another page, did not intend to revoke the entire document, and that what was left constitutes her will. We must find that she intended to leave as her last will and testament a will which appoints no executor to administer it, is devoid of specific devises, makes only one bequest to any member of her family by name, makes no bequests or gifts to charitable organizations, virtually ignores brothers, sisters, nieces, and nephews, provides no guidance for the future operation of a business, to the operation of which she had devoted her life, and gives her entire estate to grandnieces and grandnephews. (On August 1, 1960, the decedent had two grandnephews, ages five and two, and one grandniece, age two, all being the grandchildren of one deceased sister.) We find it difficult to believe that such an unlikely result was ever intended by the decedent, or that she had any intention at the time she mutilated her will other than the intent to render the will inoperative.

Miss Jessup intentionally mutilated her will. This fact is not denied. The proponents are therefore faced with the presumption that it was revoked. At the conclusion of their case and after the paper writing of August 1, 1960, and the "memo" had been introduced and Mr. Burruss had testified, the trial court compared the facts in *McKenzie* v. *Francis,* 214 Va. 104, 197 S.E.2d 221 (1973), with the facts in the instant case and held:

> And reading on [from *McKenzie*] "Since total obliteration could have been achieved as readily as partial obliteration, partial obliteration is 'evidence to the contrary'." Now in that case it turned on the question of accident, in this case there is no question but what the act can be presumed to be intentional having been in the possession of the testatrix. The only question is whether it is sufficient to indicate an intent to revoke the entire instrument and, as the court said, examining the instrument itself can furnish the evidence of a contrary intent, that which is the rebuttal required of the proponents. My ruling is that the motion to strike should be denied on that ground, that the instrument itself reveals circumstances which are sufficient to be considered rebuttal testimony or rebuttal evidence, not testimony within the meaning of the McKenzie case and the statute. And the fact that the signature was intact and that a number of pages

were intact indicates partial revocation and if further revocation is to be decided or declared, it would have to be upon the evidence offered by the contestants, which, of course they have the right to do. As the court goes on to say on page 107, "with the presumption neutralized, the burden of proving revocation falls on the contestants." And that's where we find the evidence on this issue right now. On the revocation I rule that the presumption has been neutralized and the burden shifts to the contestants to show any revocation which may include these acts or any other that this is partial evidence for them as well. . . .

The trial court took out of context and misconstrued our language in *McKenzie* to the effect that "[s]ince total obliteration [of the will] could have been achieved as readily as partial obliteration, partial obliteration is 'evidence to the contrary'." *Id.* at 106, 197 S.E.2d at 223. There, a paper writing written wholly in the handwriting of a decedent was found in her personal effects and presented to the clerk of the court for probate. The clerk refused probate because a part of the decedent's signature and the right-hand portion of each of the five pages of the instrument were completely obliterated and illegible to the human eye. This order was appealed by parties who were named as beneficiaries in the will. Upon a trial the proponents of the will established by expert testimony that they were among the beneficiaries under the purported will and that what had been obliterated and was illegible to the human eye was made legible and could be deciphered by ultra violet examination, including the signature of the testatrix. The expert testimony showed that the obliteration to the instrument was probably caused by its being soaked in water for a period of at least three days. The proponents showed that some time after the will was written a water pipe burst in the room above the room in which the will was found. They also showed that when the damage to the will occurred it was encased in an envelope and that the will must have been completely dried out before the envelope was ever opened. Upon the basis of this testimony the trial court refused to strike the evidence of the proponents. We agreed and held specifically *that the proponents' evidence was sufficient to rebut the presumption*. Those who contested the will in *McKenzie* attempted to show that the decedent stated that she had spilled a drink on her will, it was no good, had been ruined, and her signature could not be read. We held that the trial court did not err in holding as a matter of law that the contestants had failed to bear the burden of

proving that the obliteration was an act performed by the testatrix with the intention of revoking her will.

In *McKenzie* we took occasion to compare *Sutherland* v. *Sutherland,* 192 Va. 764, 66 S.E.2d 537 (1951), and *Franklin* v. *McLean,* 192 Va. 684, 66 S.E.2d 504 (1951). We noted that *Sutherland* involved a lost will and that there the presumption of revocation had to be overcome by "clear and convincing evidence." And we noted that *Franklin* involved a defaced will, and the presumption of revocation cast upon the proponents the burden of producing "evidence to the contrary." This evidence did not necessarily have to be testimonial but could be physical and circumstantial.

We did not hold, however, that the presumption of revocation applied only where there was a complete destruction, obliteration, or cancellation of a will. It also applies to a will which has been tampered with in some manner by cutting, tearing, or burning. Our holding went to the strength of the presumption and to the weight of the testimony necessary to overcome, rebut, or neutralize the presumption. A mutilated will seldom is one that is completely destroyed. There usually remain words, phrases, paragraphs, and even pages that are legible and unmarked. The mere fact that the mutilation is only partial does not of itself satisfy or neutralize the presumption of a revocation. The presumption remains until it is overcome. The kind and degree of the mutilation and a consideration of what remains of the mutilated instrument may or may not be sufficient to overcome the presumption. If such were not true, there would be no presumption without a total destruction or a total obliteration, and the presumption would serve no purpose.

In *McKenzie* the presumption was overcome by expert and other testimony and by an inference that the immersion was accidental and not purposeful. Our reasoning was that a person intending to revoke a will by mutilation, and who selected immersion in water as the means, would not likely immerse only the upper right-hand portions of the will's pages and the signature.

*Hospital* v. *First National Bank,* 199 Va. 524, 100 S.E.2d 721 (1957), relied upon by defendants, is inapposite. That case did not deal with a mutilated will, one from which pages had been torn and a paragraph deleted. There, the testator cancelled a clause (bequest) in his holographic will by drawing lines through the names and making an appropriate marginal notation. We found such a partial revocation of a holographic will by interlineation to be unobjectionable, citing *Ruth* v. *Jester, Adm'r, supra.* An example of a deletion can be

found in the case under review. Miss Jessup deleted (lined through) from page 4 of her August 1, 1960 will the sentence, "I am in my right Mind—I know what I own and have evidence in my records to prove it—" Had she done nothing further to her "booklet" we would not be concerned here with any presumption to revoke. But such is not the case.

Borrowing language from *Sharpe* v. *Sharpe and Others,* 29 Va. (2 Leigh) 249, 255 (1830), we believe the main question is whether Miss Jessup, by tearing pages and paragraphs from her booklet, designed what was left as a will, or only as a note, memorandum, project, or plan, or, using her language, as "instructions" to be followed as guidelines of a will to be made by her at a later date.

The contestants say that it was the intention of Miss Jessup to revoke her will. They contend that the substance of the will was torn or cut therefrom and that what was left, designated as "special instructions," was in fact a memorandum which the decedent planned to use, and did in fact use, when she attempted to write a second will in January 1963.[5] The contestants here are aided by a presumption which the proponents had to overcome, by the fact that even prior to the mutilation the decedent had not completed her will and planned to write more, and by the further fact that what was left unmutilated obviously did not operate to dispose of the decedent's estate in the manner she had contemplated.

The only evidence of the proponents to overcome the presumption of revocation is the remnant of the August 1, 1960 mutilated document from which it can be argued that at the time it was written the decedent desired her debts to be paid, debts due her to be forgiven, certain dairy employees rewarded, ten shares of dairy stock given to Mr. Burruss, and her Pepsi Cola stock given to her brother, all gifts having been expressed in precatory language.

Upon a consideration of what remains of the August 1, 1960 will, we hold that the decedent intended by her act of mutilation to revoke it. The presumption that she did so intend to revoke has not been overcome by evidence to the contrary.

Accordingly, we conclude that the trial court erred in denying the contestants' motion to strike the evidence introduced by the proponents of the will. Miss Jessup's will of August 1, 1960, having been revoked by mutilation, the final decree of the lower court is

---

[5] The court is not oblivious of the fact that much of the language contained in the decedent's January 19, 1963 writing was lifted verbatim from her August 1, 1960 writing.

reversed, and this cause is remanded for such further proceedings as may be indicated consistent with this opinion.

*Reversed and remanded.*